IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-----------------------------------------------------------------------X

AMANDA CESARE and STACY BUFFHAM,

        Plaintiff,

                                      Case No. 3:23-cv-00253-VDO

            -against-

PACT MSO, LLC,

                                        MAY 23, 2024

        Defendant.

-----------------------------------------------------------------------X

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

      As supplemental authority in support of their Memorandum of Law in Opposition to Defendant PACT MSO, LLC's, Motion for Summary Judgment, Plaintiffs respectfully submit the attached Decision and Opinion of the United States Court of Appeals for the Tenth Circuit (*Jane Does 1-11, et al* v. *the Board of Regents of the Univ. of Colorado et al.*) (10th Cir. Case No. 21-1414 & 22-1027, decided May 7, 2024) ("the Opinion")(annexed hereto). Specifically, the Court is referred to Opinion pages, 47 n. 9, 51, 51, n. 10, 52-54, in discussing obligations of employers under Title VII of the Civil Rights Act of 1964 as it applies to religious accommodation requests for the COVID-19 vaccine to employer policies of mandatory employee vaccination and what constitutes discriminatory religious animus when employers deny request for accommodation based on sincerely held religious beliefs under Title VII.

                                Respectfully submitted,
                                */s/Christopher J. Berlingieri*
                                Christopher J. Berlingieri
                                (ct 30335)
                                BERLINGIERI LAW, PLLC
                                *Attorneys for Plaintiffs*
                                244 Fifth Avenue, Suite F276
                                New York, New York 10001
                                Tel.:(347) 766-5105
                                Email: cjb@nyctlaw.com

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that on May 23, 2024 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing as indicated below. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/*Christopher J. Berlingieri*
Christopher J. Berlingieri

FILED
United States Court of Appeals
Tenth Circuit

May 7, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

JANE DOES 1-11; JOHN DOES 1, 3-7,

    Plaintiffs - Appellants,

v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF COLORADO; TODD
SALIMAN, President of the University of
Colorado, in his official capacity;
DONALD M. ELLIMAN, Chancellor of
the University of Colorado Anschutz
Campus, in his personal and official
capacities; SHANTA ZIMMER, Senior
Associate Dean of Medical Education,
University of Colorado School of
Medicine, in her personal and official
capacities; ERIC MEDIAVILLA,
Associate Dean for Student Affairs,
University of Colorado School of Dental
Medicine, in his personal and official
capacities; ANN-MICHAEL HOLLAND,
Master of Science Program Director,
Department of Anesthesiology, in her
personal and official capacities; JOHN &
JANE DOES 19, members of the Vaccine
Verify team, in their official & personal
capacities,

    Defendants - Appellees.

Nos. 21-1414 & 22-1027

_____

**Appeals from the United States District Court
for the District of Colorado
(D.C. No. 1:21-CV-02637-RM-KMT)**

_____

Michael G. McHale, Thomas More Society, Omaha, Nebraska (Joseph B. Brown and Theresa L. Sidebotham, Telios Law, Monument, Colorado; and Peter C. Breen, Thomas More Society, Chicago, Illinois; with him on the briefs), for Plaintiffs-Appellants.

Jacquelynn Rich Fredericks, First Assistant Attorney General (Philip J. Weiser, Attorney General, Kathleen Spalding, Senior Assistant Attorney General, Grant T. Sullivan, Assistant Solicitor General, Megan Paris Rundlet, Senior Assistant Solicitor General; Hermine Kallman Special Assistant Attorney General, University of Colorado; and Matthew J. Smith and Gregory Goldberg, Holland & Hart, LLP; with her on the briefs), Denver, Colorado, for Defendant-Appellee.

_____

Before **HOLMES**, Chief Judge, **EBEL**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

A government employer may not punish some employees, but not others, for the same activity, due only to differences in the employees' religious beliefs. Likewise, the government may not test the sincerity of an employee's religious beliefs by judging whether his or her beliefs are doctrinally coherent or legitimate in the eyes of the government. Nor may a government employer discriminate against religion by implementing policies that exempt employees for secular reasons more readily than religious ones. All such discrimination violates the Free Exercise and Establishment Clauses of the First Amendment and the corresponding rights incorporated against the states by the Fourteenth Amendment. And when there is no plausible explanation for religious discrimination other than animus, it is subject to strict scrutiny, regardless of whether the government employer admits that its actions were motivated by hostility to certain religions.

This appeal concerns policies at the University of Colorado Anschutz Campus regarding religious exemptions from the University's COVID-19 vaccine mandate for employees and students.  We must determine whether the employee plaintiffs in this case are entitled to preliminary injunctions against the Anschutz Campus Administration's policies, which in turn requires us to decide several questions. First, we hold that an employer such as the Administration cannot moot its employees' suits to enjoin unlawful policies by firing its employees under those policies.  Therefore, we hold that at least one employee still has standing with respect to each policy at issue in this appeal.  And because neither of the Administration's policies complies with the Constitution, the employee plaintiffs must prevail.  We hold that a government policy may not grant exemptions for some religions, but not others, because of differences in their religious doctrines, which the Administration's first policy did.  We further hold that the government may not use its views about the legitimacy of a religious belief as a proxy for whether such belief is sincerely-held, which the Administration did in implementing the first policy.  Nor may the government grant secular exemptions on more favorable terms than religious exemptions, which the Administration's second policy does.  Finally, we hold that the policies at issue in this appeal were motivated by religious animus, and are therefore subject to strict scrutiny—which neither policy survives.  The district court concluded otherwise and, in so doing, abused its discretion.  Accordingly, we reverse.

## I.    Factual & Procedural History

The University of Colorado announced in April 2021 that the University would require all employees and students to receive a COVID-19 vaccine by fall semester—with some exceptions.  Rather than announce a universal policy for medical, religious, or other exemptions, the University permitted each campus to adopt its own policy and process.  The Jane Doe and John Doe plaintiffs in this case (the "Does") were each employed by or enrolled at the University's Anschutz Campus, although some worked off-campus at other locations.  The administration of the Anschutz Campus (the "Administration") purported to allow "students and employees to attest to their exemption based on religious beliefs" using a simple form.  App'x Vol. V at 1036.  Each of the Does submitted such a form.

But in August 2021, the Administration began enforcing a new policy, which would officially take effect September 1, 2021 ("September 1 Policy").  The September 1 Policy declared that "[a] religious exemption may be submitted based on a person's religious belief whose teachings are opposed to all immunizations."  App'x Vol. V at 1123.  The Administration made clear that it would "only accept requests for religious exemption that cite to the official doctrine of an organized religion . . . as announced by the leaders of that religion*." Id*. at 1153.

To enforce this Policy, the Administration sent emails to each applicant for a religious exemption requiring the applicant to provide additional information about her religious beliefs.  Before it would grant an exemption, the Administration required an applicant to "explain why [her] sincerely held religious belief, practice or

4

observance prevents [her] from getting the vaccination," and to provide "a detailed response."  App'x Vol. V at 1042.  The Administration also asked each applicant to explain whether she "had an influenza or other vaccine in the past," and to answer: "How does this differ?"  *Id.*  Some applicants provided pages of detailed justification for their religious beliefs.

In response, the Administration rejected any application for a religious exemption unless an applicant could convince the Administration that her religion "teaches [her] and all other adherents that immunizations are forbidden under all circumstances."  App'x Vol. V at 1056.  Therefore, as the Administration explained to Anschutz students and employees, Christian Scientists and Jehovah's Witnesses would qualify for an exemption under the Administration's criteria.  However, the Administration would reject an application for an exemption if it deemed the applicant's beliefs "personal," not "religious," or "not part of a comprehensive system of beliefs*." Id*. at 1077–78, 1129.  For example, the Administration decided that "it is 'morally acceptable' for Roman Catholics to take vaccines against COVID-19," and that any Roman Catholic objections to the COVID-19 vaccine are "personal beliefs," not "religious beliefs."  *Id.* at 1162–63.  As a result, the Administration would not grant exemptions to Roman Catholic applicants under the September 1 Policy.  For similar reasons, the Administration refused to approve exemptions for Buddhist applicants.  Nor would the Administration approve

exemptions for applicants who were members of the Eastern Orthodox Church.[1]  The Administration also rejected exemption applications from Evangelical Christians, non-denominational Protestants, and applicants who did not specify whether they were affiliated with a particular religious organization.

Accordingly, the Administration denied all of the Does religious exemptions under the September 1 Policy, and it enforced the vaccine mandate against them.  For instance, on September 20, the Administration placed Jane Doe 9 on unpaid administrative leave and fired her, effective October 2, due to her "failure to comply" with the "mandatory vaccine requirement."  App'x Vol. VI at 1383.  On September 21, the Administration told Jane Doe 2 that she would be fired in four days, but the Administration permitted her to resign in lieu of termination so that she could keep her medical license.  Under the September 1 Policy, the Administration also denied Jane Does 1, 3, 10, and 11 any exemption or accommodation.  The Administration required Jane Does 4, 5, and 6 and John Does 3, 4, 5, and 7 to work remotely, and it cut Jane Doe 5's pay by ten percent.

In response to the September 1 Policy, the Administration received several demand letters in September 2021.  The Does' counsel sent at least two such letters: one on September 3, and another on September 15.  Both letters threatened suit.

After receiving threats of litigation, the Administration announced a new COVID-19 vaccine policy, effective September 24, 2021 ("September 24 Policy").

---

[1]  Also known as the Orthodox Church, the Orthodox Christian Church, or the Orthodox Catholic Church.

Under the September 24 Policy, "[a] religious accommodation may be granted based on an employee's religious beliefs," but "will not be granted if the accommodation would unduly burden the health and safety of other Individuals, patients, or the campus community." App'x Vol. V at 1256. The September 24 Policy employs a similar, but not identical, exemption standard for medical accommodations. *See id.* at 1255–56 ("A medical accommodation will not be granted, if the accommodation poses an undue hardship or the accommodation poses a direct threat to the health or safety of the Individual or others."). The September 24 Policy does not provide any religious exemption or accommodation to students.

Jane Doe 1 and John Doe 1 filed suit to enjoin the September 1 Policy on September 29, 2021. That same day, they filed a motion for a preliminary injunction. Meanwhile, the Administration continued to enforce the September 1 Policy and, among other things, proceeded to terminate Jane Doe 2 on October 2 as threatened. On October 25, the district court denied the Does' motion, ruling that the Does had "fail[ed] to make a threshold showing as to mootness" with respect to the September 1 Policy. App'x Vol. III at 626.

So, on October 29, the Does filed an Amended & Supplemental Complaint ("Amended Complaint"). Their Amended Complaint added sixteen Doe plaintiffs: Jane Does 2 through 11 and John Does 2 through 7. In their Amended Complaint, the Does seek a preliminary injunction of both the September 1 and September 24 Policies. Namely, the Does request a preliminary injunction:

(1) restraining and enjoining the Defendants, their officers, agents, employees, attorneys and successors in office, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the

(a) September 1 Policy, to the extent it prohibits religious exemptions unless an individual holds religious beliefs that oppose all vaccinations or are in accord with official denominational "teachings,"

(b) September 24 Policy, to the extent it denies students the right to seek and receive religious exemptions,

(c) both Policies, to the extent Defendants improperly intrude into the sincerity of religious objectors at Anschutz by discerning Plaintiffs' sincerity through questioning the legitimacy of their religious beliefs or in any way more intensely than they do into the sincerity of religious objectors on other University campuses,

(d) both Policies, to the extent Defendants prohibit Plaintiffs from receiving the same accommodations allowed for individuals who have actually received medical exemptions or for those on other University of Colorado campuses who present a comparable or greater risk of spreading COVID-19 than Plaintiffs;

(2) ordering that Plaintiffs be granted their requested religious exemptions; and

(3) ordering that all prior denials of requested religious exemptions under the Policies (whatever the requesters may have called them) be revoked and the requests re-examined under conditions compliant with the United States and Colorado Constitutions[.]

App'x Vol. V at 1101. They also seek other relief, including a permanent injunction and damages. On November 2, 2021, based on their Amended Complaint, the Does renewed their motion for a preliminary injunction.

The Administration did not reconsider any of the Does' applications for religious exemptions under the September 24 Policy until December. At that time, it reevaluated the employee Does. In reevaluating the employee Does under the September 24 Policy, the Administration scrutinized each application to determine whether "the request [wa]s made based on a sincerely-held religious belief," or

whether it was based on beliefs the Administration deemed "personal" in nature. App'x Vol. VI at 1328–29.

The Administration did not grant any of the Does a religious exemption under the September 24 Policy. Accordingly, the Administration placed non-exempt clinical employees on leave or fired them. For example, after reevaluating Jane Doe 1 under the September 24 Policy, the Administration placed her on paid leave until February 2022, and then fired her. After reevaluating Jane Doe 3, the Administration placed her on indefinite unpaid leave. Under the September 24 Policy, the Administration also placed Jane Doe 10 on unpaid leave for thirty days, and then fired her. And under the same Policy, the Administration placed Jane Doe 11 on paid leave until January 31, 2022, then fired her, too.

The Administration did not fire non-clinical employees who were again denied religious exemptions under the September 24 Policy. Instead, as the Administration had under the September 1 Policy, it banned such employees from campus, and, in at least one case, cut an employee's pay. After reevaluating their applications in December, the Administration continued to require Jane Does 4, 5, and 6 and John Does 3, 4, 5, and 7 to work remotely. It also continued to pay Jane Doe 5 only ninety percent of her original pay.

On January 27, 2022, the district court denied the Does' renewed motion for a preliminary injunction. The district court denied the Does' motion to enjoin the September 1 Policy as moot, ruling that a preliminary injunction of the Policy "would have no effect in the real world." App'x Vol. VII at 1667–68. It also concluded that

the Does had not met their burden to show they are entitled to a preliminary injunction of the September 24 Policy.

The district court concluded that the Does were unlikely to succeed on the merits of their claims regarding the September 24 Policy.  The court ruled that the Policy was neutral both on its face and as applied to the Does, reasoning that the Does were unlikely to establish that the Policy was adopted "with the aim of suppressing religious belief."  App'x Vol. VII at 1670 (internal quotation marks omitted).  The district court also concluded that the Policy did not provide "individualized exemptions," and therefore did not impermissibly "invite[] the government to consider the particular reasons for a person's conduct."  App'x Vol. VII at 1672 (internal quotation marks omitted).  The district court determined that "the fact that the [Administration] amended its policy while navigating a monthslong global pandemic does not show that its reasons for denying religious exemptions for students are pretextual*." Id*. at 1670.  Accordingly, the district court decided that the Policy was generally applicable.  The district court therefore declined to apply strict scrutiny and ruled that the Does were unlikely to succeed in showing the September 24 Policy is unconstitutional.

The district court also concluded that the other preliminary injunction factors weighed against the Does.  The court determined that the Does had "failed to demonstrate a likelihood of success on their constitutional claims," and thus ruled that their "asserted harm is not of a constitutional dimension," and therefore not irreparable.  App'x Vol. VII at 1674.  Finally, the court decided that the public

interest would not be served by enjoining the September 24 Policy because of the Administration's interest in promoting vaccination among employees and students.

The Does timely appealed both denials of their motions for preliminary injunctions.[2]  On appeal, the Does contend that the September 1 and September 24 Policies "violat[e] their fundamental rights as guaranteed by the First Amendment's Religion Clauses"—both of them—and thus seek relief under both clauses.  Aplt. Br. at 32.[3]

Since the Does filed this appeal, the parties have filed numerous letters updating this Court about changes in the Does' status and the Administration's policies.[4]  The Does have informed us that "Jane Does 7 and 8 and John Does 3, 4, and 6 no longer need preliminary injunctive relief."  Aplt. Response to Aple. Letter Pursuant to Fed. R. App. P. 28(j) (Aug. 16, 2023) ("August 16 Letter") at 2.  In addition, the Administration tells us that Jane Does 4, 5, and 6, and John Does 5 and 7 have been instructed that they may return to campus, notwithstanding the fact that they are unvaccinated and maintain their religious beliefs opposing the COVID-19 vaccine.  Aple. Letter Pursuant to Fed. R. App. P. 28(j) (Aug. 11, 2023)

---

[2]  John Doe 2 was voluntarily dismissed and did not appeal.

[3]  The partial dissent suggests that the Does "did not raise [the Establishment Clause] on appeal."  Partially Dissenting Opinion ("Dissent. Op.") at 14 n.4; *see also id.* at 6 n.2.  But the Does raise the "Religion Clauses" and cite cases that commingle analysis of the two clauses.  As we routinely do in appeals involving the Religion Clauses, we consider whether the challenged conduct violates either the Establishment Clause or the Free Exercise Clause, or both.

[4]  As most of these letters do not inform our decision, we do not recount all of them here.

("August 11 Letter") at 2.  Finally, the Does have advised the Court that Jane Does 1, 2, 3, 10, and 11 remain "under- or entirely unemployed" as a result of the September 1 and September 24 Policies.  August 16 Letter at 2.

## II.  Standard of Review

We must reverse a district court's denial of a preliminary injunction if the district court abused its discretion.  *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009).  A district court abuses its discretion when it "commits an error of law or makes clearly erroneous factual findings."  *Id.*  An abuse of discretion may be "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id.*  We examine questions of law de novo and we review factual findings for clear error.  *Id.*

## III.  Our Court has the constitutional authority to resolve this appeal.

It is within our constitutional authority to resolve this appeal.  "Our authority under the Constitution is limited to resolving 'Cases' or 'Controversies.'"  *Dep't of Educ. v. Brown*, 143 S. Ct. 2343, 2351 (2023) (citing U.S. Const. art. III, § 2); *see also* U.S. Const. art. III, § 1.  Accordingly, a plaintiff in federal court "must demonstrate that he possesses a legally cognizable interest, or personal stake, in the outcome of the action" from the outset, or his suit must be dismissed.  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks omitted).  If "at least one plaintiff" has a personal stake—called "standing"—then "the suit may proceed."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023).  And at least one plaintiff must maintain a personal stake, such that "an actual controversy" is

"extant at all stages of review, not merely at the time the complaint is filed."

*Symczyk*, 569 U.S. at 71.  Otherwise, "the action can no longer proceed and must be

dismissed as moot."  *Id.* at 72.  These related doctrines, standing and mootness,

"implement[]" the Constitution's "limit on our authority."  *Brown*, 143 S. Ct. at 2351.

We review de novo whether the litigants before us have standing and whether the

case is moot.  *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293,

1296 (10th Cir. 2023); *Schell v. OXY USA Inc.*, 814 F.3d 1107, 1114 (10th Cir.

2016).

At least one plaintiff had a personal stake in enjoining each Policy at issue in

this case when the Does filed their Amended Complaint.  And at least one plaintiff

still has a personal stake in enjoining each Policy as it concerns employees.

Therefore, this appeal remains an Article III case that a federal court has the

authority to resolve.[5]

## A.    At least one plaintiff had standing to seek a preliminary injunction regarding each Policy.

At the time of the Amended Complaint, at least one plaintiff in this case had

demonstrated Article III standing to challenge each Policy at issue in this appeal.

"The party invoking federal jurisdiction bears the burden of establishing standing,"

---

[5] Appeal number 21-1414 appeals the denial of a motion for a preliminary injunction under the Does' first complaint.  That complaint was superseded by the Does' Amended Complaint, thereby mooting the motion.  We therefore cannot grant any effective relief in appeal number 21-1414.  We GRANT the Administration's motion to dismiss appeal number 21-1414 as moot, and consider only appeal number 22-1027.

13

so it is the Does' burden here. *W. Watersheds Project*, 62 F.4th at 1296. "To satisfy the irreducible constitutional minimum of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021) (internal quotation marks omitted). A plaintiff must have standing to invoke the district court's jurisdiction "at the commencement of the litigation," and she must "demonstrate standing for each form of relief sought"—here, a preliminary injunction. *W. Watersheds Project*, 62 F.4th at 1296 (internal quotation marks omitted).

The Does met their burden. With respect to the September 1 Policy, each of the Does had standing at the time of the Amended Complaint because each had been denied a religious exemption under the September 1 Policy, and the preliminary injunction the Does sought was likely to redress their injuries by requiring the Administration to revoke and to reconsider its denials. When the Does filed their Amended Complaint on October 29, 2021, each had been denied a religious exemption under the September 1 Policy. *See, e.g.*, App'x Vol. V at 1027 ("In late August 2021, [Jane Doe 4's] request to be exempted from Defendants' vaccine mandate . . . was denied with finality [under the September 1 Policy]."). Accordingly, they each had suffered an injury-in-fact traceable to the challenged policy. *See Uzuegbunam*, 141 S. Ct. at 797. No plaintiff was reevaluated under the September 24 Policy until after the Does filed their Amended Complaint. *See* App'x Vol. VI at 1328 ("[R]e-evaluations of all employee requests for religious

accommodation that were evaluated under the prior September 1, [sic] policy . . . will be completed by the end of December 2021."); *see also, e.g.*, *id.* at 1332 (reevaluating Jane Doe 4 under the September 24 Policy on December 9, 2021). Therefore, at the time of the Amended Complaint, a preliminary injunction requiring the Administration to revoke and to reconsider its decisions under the September 1 Policy would have redressed the Does' injuries. *Uzuegbunam*, 141 S. Ct. at 797. That is enough for standing.

Although it had not yet been enforced against them, the Does also had standing with respect to the September 24 Policy. At the time the Amended Complaint was filed, Jane Does 1 through 11 and John Does 1 through 7 were each employed by Anschutz, enrolled there, or seeking restoration of his or her employment or enrollment. The Does all had reason to believe they would likely be subject to the September 24 Policy, and therefore suffer constitutional injury to their rights to exercise their religions and to be free from the government's establishment of religion. The injunction they sought would remedy that injury by requiring the Administration properly to issue religious exemptions. Thus, the Does also had standing to seek a preliminary injunction of the September 24 Policy.

Since "at least one plaintiff" had standing with respect to each Policy at the time of the Amended Complaint, the Does' suit does not fail for lack of standing. *Nebraska*, 143 S. Ct. at 2365.

**B.    There remains an actual controversy with respect to both Policies.**

At least one employee plaintiff still has standing to seek injunctive relief with respect to each Policy, so neither appeal is moot with respect to the Administration's policies for employees.  However, no student has standing to seek a preliminary injunction, so this appeal is moot as it concerns the Administration's policies for students.

The Constitution's limit on our authority is continuous; thus, if no "actual controversy" remains, "the action can no longer proceed and must be dismissed as moot."  *Symczyk*, 569 U.S. at 71–72.  To maintain an "actual controversy," at least one plaintiff must maintain standing "at all stages of review, not merely at the time the complaint is filed."  *Id.*  If there is still "at least one plaintiff" who "clearly has standing" and whose "claim is not moot," that "is sufficient to satisfy Article III's case-or-controversy requirement."  *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 29 n.1 (10th Cir. 2013).  "The burden of demonstrating mootness is a heavy one," and it falls upon the Administration in this case.  *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012) (internal quotation marks omitted).

The Administration failed to meet its heavy burden to show that this appeal is moot with respect to the employee Does.  The Does concede that "Jane Does 7 and 8 and John Does 3, 4, and 6 no longer need preliminary injunctive relief."  August 16 Letter at 2.  Accordingly, although those plaintiffs' actions for damages remain live, their claims for preliminary injunctive relief are moot.  Furthermore, this appeal is moot as it concerns the one remaining student, John Doe 1, because he intends to

16

seek a leave of absence from Anschutz no matter the outcome of this appeal.

However, there is still an actual controversy with respect to at least one employee

plaintiff for each Policy, so the Does' appeal of the district court's denial of their

motion for a preliminary injunction is not moot as it concerns the policies applied to

employees.

1.    **At least Jane Does 2 and 9 have standing to seek a preliminary injunction of the September 1 Policy.**

Because they are still suffering injury from the enforcement of the

September 1 Policy, Jane Does 2 and 9 still have standing to seek equitable relief

with respect to such policy, and their appeal is not moot.  The district court ruled that

the September 1 Policy was moot in part because the Does "ha[d] not established"

otherwise.  App'x Vol. VII at 1668.  But the burden here falls upon the

Administration as the party asserting mootness.  *Rezaq*, 677 F.3d at 1008 (burden

falls on party asserting mootness).  To place the burden on the Does was contrary to

our precedent, and therefore an abuse of discretion.  *See Tyson Foods*, 565 F.3d

at 775.  Had the district court held the Administration to its heavy burden, the district

court would have reached a different conclusion:  the Administration failed to show

that equitable claims regarding the September 1 Policy are moot.

The Administration contends that the September 1 Policy is dead letter

because it was "rescinded and replaced" with the September 24 Policy.  Aple. Br.

at 23.  The Administration further attests that there is no risk that the September 1

Policy "continues to be in effect or is likely to be reinstated."  *Id.* at 24.  As the

Administration would tell it, there is no threat the September 1 Policy will ever be enforced against any plaintiff in the future.

If that were true, it would come as welcome news to Jane Doe 2. But as far as this Court is aware, the Administration has not changed its application of the September 1 Policy to Jane Doe 2. The Administration informed Jane Doe 2 on September 21, 2021, that the Administration was firing her under the September 1 Policy, effective September 25. She was given the option of resigning in lieu of termination to preserve her licensure, and she took it. The Administration has made no attempt to reevaluate or to rehire her under the September 24 Policy or any subsequent policy. Therefore, Jane Doe 2 continues to suffer harm from the Administration's initial application of the September 1 Policy and its failure to reverse course. Although the Administration is right that "self-correction . . . provides a secure foundation for mootness so long as it seems genuine," the Administration has not corrected its enforcement of the September 1 Policy against Jane Doe 2, so there has been no opportunity for this Court to consider whether such self-correction would be genuine. Aple. Br. at 23 (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1118 (10th Cir. 2010)).

A preliminary injunction would abate Jane Doe 2's continuing injury. Among other things, the Does seek a preliminary injunction "ordering that all prior denials of requested religious exemptions under the Policies . . . be revoked and the requests re-examined under conditions compliant with the United States and Colorado Constitutions." App'x Vol. V at 1101. Because Jane Doe 2 was most recently

denied a religious exemption under the September 1 Policy, and because the Administration's denial of that exemption has never been reconsidered under any subsequent policy, a preliminary injunction would require the Administration to revoke and to re-examine its application of the September 1 Policy to Jane Doe 2. That relief would necessarily entail revocation of the Administration's decision unlawfully to terminate Jane Doe 2's employment under the September 1 Policy. Therefore, this Court "could . . . cause a real-world effect through a favorable decision" for Jane Doe 2. *W. Watersheds Project*, 62 F.4th at 1298. Since a preliminary injunction would redress Jane Doe 2's injury under the September 1 Policy, Jane Doe 2 has the necessary personal stake in obtaining such injunction, and her appeal is not moot.[6]

The same is true of Jane Doe 9. On September 20, 2021, the Administration placed Jane Doe 9 on unpaid administrative leave and fired her effective October 2, 2021. The Administration told Jane Doe 9 that it fired her "[d]ue to [her] failure to comply with the [Administration's] vaccination policy," namely, the "mandatory vaccine requirement" for those who work on-campus who have not been granted an exemption. App'x Vol. VI at 1383. The Administration did not reevaluate Jane

---

[6] The Administration also contends that Jane Doe 2's appeal is moot because the district court dismissed her from the underlying case. *See* Aple. Letter Pursuant to Fed. R. App. P. 28(j) (Oct. 4, 2022). But the district court has not entered any final judgment as to Jane Doe 2, so she maintains a stake in the outcome of this appeal. *Cf. U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1512 (10th Cir. 1988) (holding an appeal regarding preliminary injunction mooted by final judgment); *see Wellington v. Daza*, 795 F. App'x 605, 608 (10th Cir. 2020) (unpublished) ("[B]y its plain terms, this rule applies only where there is a *final* judgment.").

Doe 9 under the September 24 Policy, and the Administration did not rescind its decision made under the September 1 Policy, so Jane Doe 9 continues to suffer harm from the September 1 Policy.  Therefore, like Jane Doe 2, Jane Doe 9 has a personal stake in a preliminary injunction revoking the Administration's unlawful decision to fire her under the September 1 Policy.  Jane Doe 9's appeal is not moot, either.

As the Administration would tell it, its enforcement of the September 1 Policy was complete after it fired Jane Does 2 and 9, so no equitable relief is available to either.  But that would be true only if federal courts were powerless to enjoin unlawful behavior that has already begun.  If the Administration were correct, any state could adopt a policy that all state employees must be Roman Catholic; rush to enforce it by firing Protestants, Buddhists, Jews, atheists, and others; nominally repeal the policy, without rehiring anybody; and then claim any suits for injunctive relief were moot, leaving only damages actions likely barred by sovereign immunity.

Fortunately for state employees of all faiths, it is not so easy to evade the federal courts' powers in equity.  "It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo."  *Porter v. Lee*, 328 U.S. 246, 251 (1946).  If, "without any fault of the defendant, an event occurs which renders it impossible for this court . . . to grant [the plaintiff] any effectual relief whatever," the case is moot.  *Mills v. Green*, 159 U.S. 651, 653 (1895).  But if the defendant is responsible for the intervening events, "the court nevertheless is not

deprived of the authority, whenever, in its opinion, justice requires it . . . to compel the defendant to undo what he has wrongfully done since that time." *Id.* at 654.

This case is not moot because the Administration is at fault for firing Jane Does 2 and 9 after receiving notice of this suit. The Administration received notice of this suit on September 16, denied Jane Doe 2's exemption the next day, informed Jane Doe 9 on September 20 that she would be fired, and told Jane Doe 2 the same on September 21. The Does filed suit to enjoin the Policy on September 29, but the Administration still proceeded to fire Jane Doe 9 on October 2. Accordingly, Jane Does 2 and 9 are "entitled to seek a restoration of the status quo in this case," namely, their employment. *Porter*, 328 U.S. at 251. Likewise, we have the authority to compel the Administration "to undo what [it] has wrongfully done." *Mills*, 159 U.S. at 654.

Furthermore, even after a policy is repealed, "injunctive relief is still called for" when an appellant "remain[s] under a constant threat" that the policy will be reinstated or enforced in the future. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). The Administration argues that it has no intent to enforce the "now-defunct September 1 Policy" or anything like it. Aple. Br. at 24. We are unconvinced. It is easy enough for a defendant to say, while still under the watchful eye of the judiciary, that the defendant has no intent of resuming its poor behavior. *See, e.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587, 2606–07 (2022). But when the government demonstrates religious animus as severe as the Administration's animus in this case, *see infra* at Part IV.A.1., a court must look skeptically at the

government's claimed change of heart.  And since the Administration has yet to reverse its decisions to fire Jane Does 2 and 9 under the September 1 Policy, the Administration has provided no justification for us to set aside our skepticism.  For this reason, too, the Does' request for a preliminary injunction of the September 1 Policy is not moot.

2.     **At least Jane Does 1, 3, 10, and 11 have standing to seek a preliminary injunction of the September 24 Policy.**

Several of the employee Does maintain standing to seek a preliminary injunction against enforcement of the September 24 Policy because they still suffer a continuing injury from it.  In December 2021, the Administration finally reevaluated its current employees under the September 24 Policy.  Under the September 24 Policy, the Administration placed Jane Doe 1 on paid leave until February 2022, and then fired her.  The Administration placed Jane Doe 3 on indefinite unpaid leave. The Administration placed Jane Doe 10 on unpaid leave for thirty days, and then fired her.  The Administration placed Jane Doe 11 on paid leave until January 31, 2022, then fired her, too.  As far as this Court is aware, Jane Does 1, 3, 10, and 11 remain "under- or entirely unemployed."  August 16 Letter at 2.

Jane Does 1, 3, 10, and 11 maintain standing to seek an injunction revoking the Administration's decisions to place them on leave or to fire them under the September 24 Policy.  Because Jane Does 1, 3, 10, and 11 are suffering from the Administration's continued enforcement of the September 24 Policy against them, an

injunction requiring the Administration to revoke its unlawful decisions under the Policy would abate their continuing constitutional injury.

The parties dispute whether this appeal is moot with respect to employees who were forced to work remotely, but who now have been given permission to return to the Anschutz Campus. *Compare* August 11 Letter at 2, *with* August 16 Letter at 2–3. Namely, Jane Does 4, 5, and 6, and John Does 5 and 7 have been instructed that they may return to campus, notwithstanding that they are unvaccinated and maintain their religious beliefs opposing the COVID-19 vaccine. August 11 Letter at 2. These Does contend their appeal is not moot because they have no assurances the Administration will not resume its unconstitutional conduct. August 16 Letter at 2–3. However, because this appeal is certainly not moot with respect to Jane Doe 1, 3, 10, or 11, we need not resolve the mootness question for Jane Doe 4, 5, or 6, or John Doe 5 or 7. Since "at least one plaintiff" still has a personal stake in our decision regarding the September 24 Policy, "the suit may proceed." *Nebraska*, 143 S. Ct. at 2365; *see Taylor*, 713 F.3d at 29 n.1 (explaining that the presence of "at least one plaintiff" who "clearly has standing" and whose "claim is not moot . . . is sufficient to satisfy Article III's case-or-controversy requirement").

### 3. The students' appeals are moot.

No student still has standing to seek a preliminary injunction in this case, and this appeal is therefore moot as it concerns the September 24 Policy for students. This appeal involved four students: Jane Does 7 and 8, and John Does 1 and 6. The Does concede that this appeal is moot as it concerns Jane Does 7 and 8 and John

23

Doe 6. They contend only that the original student Plaintiff, John Doe 1, still has standing to seek an injunction against enforcement of the September 24 Policy for students.

This appeal is also moot as it concerns John Doe 1 because a preliminary injunction would not have any effect on John Doe 1 in the real world. We have no constitutional authority to issue a decision that would have no "real-world effect." *W. Watersheds Project*, 62 F.4th at 1298. According to the Does, John Doe 1 "intends to seek an additional Leave of Absence . . . given his current financial inability to afford the increased tuition since he was forced into his initial Leave of Absence, along with the lack of protection for his religious objection to COVID vaccination." August 16 Letter at 2. John Doe 1 may still have non-moot claims for other relief at law or in equity. However, because John Doe 1 cannot afford the increased tuition at Anschutz, and because he intends to take a leave of absence regardless of the outcome of this appeal, we cannot grant any effective *preliminary* relief to John Doe 1, and our disposition of this appeal would have no "real-world effect" on him. *W. Watersheds Project*, 62 F.4th at 1298. Accordingly, although the students may still seek damages for any deprivation of their constitutional rights, no student still has standing to seek a preliminary injunction of the September 24 Policy, and the students' appeals are moot. Our further analysis of the September 24 Policy concerns only the Policy as it applies to employees.

Because the Does have standing and this appeal is not moot as to the September 1 Policy or the September 24 Policy as they concern employees, we may proceed to the merits.

## IV.    The district court abused its discretion in failing to enjoin either Policy.

The district court abused its discretion in failing to grant the Does' motion for a preliminary injunction of the September 1 and September 24 Policies. "Under the traditional four-prong test for a preliminary injunction, the party moving for an injunction must show:  (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) ("*Hobby Lobby*"), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). The third and fourth prongs "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

When evaluating likelihood of success on the merits, it is critical to consider all factors that may bear on the probability that the moving party will succeed.  For instance, when the Supreme Court evaluates the likelihood of success on the merits, it must also weigh the likelihood that the Supreme Court will "grant review in the case." *Does 1-3 v. Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring); *see also United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring); *Labrador v. Poe ex rel Poe*, No. 23A763, 2024 WL 1625724, at *9 (U.S. Apr. 15, 2024) (Kavanaugh, J., concurring).  In an appeal on the final merits, an appellant's success

on one issue may render it redundant, and thus unnecessary, for us to decide further issues.  (For instance, if an appellant has forfeited a claim, we typically do not resolve it on the merits.)  At the preliminary injunction stage, though, our task differs.  If the moving party is likely to succeed on each of several theories, the party's argument for preliminary relief is stronger than if the party has only one claim that is likely to be viable.  Accordingly, we may in our discretion consider all of a moving party's potential paths to success on the merits, even if his ultimate success on one claim would render the other claims redundant.

The burdens of proof are distributed among the parties here.  "To succeed in [their] quest for a preliminary injunction," the Does "assume[] the burden of making a strong showing that [they are] likely to succeed on the merits." *Awad v. Ziriax*, 670 F.3d 1111, 1129 (10th Cir. 2012).  However, "burdens at the preliminary injunction stage track the burdens at trial," so the Administration "bears the burden of proof on the ultimate question of the challenged [rules'] constitutionality." *Id.* (internal quotation marks and citation omitted).  Accordingly, if the Does show that the Administration "has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable,'" this Court must "find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993) ("*Lukumi*")).

**A.    The district court abused its discretion in failing to enjoin the September 1 Policy.**

All the factors weigh in favor of granting a preliminary injunction of the September 1 Policy, and the district court abused its discretion in failing to do so. The Does are highly likely to succeed on the merits, because the September 1 Policy discriminates on its face and in fact against certain religions due to stereotypes and religious animus. Moreover, the irreparable constitutional harm the Does continue to suffer outweighs any public interest against enjoining the September 1 Policy.

**1.    The Does are likely to prevail on the merits.**

The Does are likely to succeed on the merits because the September 1 Policy clearly violates the Establishment Clause and the Free Exercise Clause as interpreted by our precedents. The First Amendment bars Congress from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Fourteenth Amendment secures these First Amendment rights against the states. U.S. Const. amend. XIV, § 1; *see Lukumi*, 508 U.S. at 531. But the Administration, in its September 1 Policy, ran afoul of both guarantees.

**a.    The Does are likely to prevail because the September 1 Policy is categorically unconstitutional.**

Because the September 1 Policy is permeated with animus against certain religions, and because it involves an intrusive inquiry into the Does' religious beliefs, the Does are likely to prevail on their Free Exercise Clause and Establishment Clause claims. If a government policy is motivated by religious animus, the policy is categorically unconstitutional under the Free Exercise Clause. *Ashaheed v.*

27

*Currington*, 7 F.4th 1236, 1244 (10th Cir. 2021).  For similar reasons, a government policy that requires an intrusive inquiry into the validity of religious beliefs violates the Establishment Clause regardless of any purported government interest.  *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1261 (10th Cir. 2008).  The September 1 Policy thus violates both.

i.       **The September 1 Policy categorically violates the Free Exercise Clause.**

As we have explained, "[a]lthough violations of the . . . Free Exercise Clause are generally analyzed in terms of strict scrutiny, where governmental bodies discriminate out of animus against particular religions, such decisions are plainly unconstitutional," regardless of any compelling interests advanced by the government.  *Ashaheed*, 7 F.4th at 1244 (internal quotation marks and alterations omitted).  That is because "government action motivated by religious animus cannot be 'narrowly tailored to advance' 'a compelling governmental interest.'"  *Id.* (quoting *Lukumi*, 508 U.S. at 531).  Accordingly, when the government "impose[s] regulations that are hostile to the religious beliefs of affected citizens" or "act[s] in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices," it is appropriate to "set aside" the regulation.  *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731–32 (2018).

The Does are likely to prove that the September 1 Policy was motivated by animus toward certain religions because the Policy passes judgment upon and presupposes the illegitimacy of certain religious beliefs.  The September 1 Policy discriminates on its face against "religious belief[s]" that are "opposed" to the

COVID-19 vaccine, but not necessarily "opposed to all immunizations."  App'x

Vol. V at 1123.  It also discriminates explicitly against religious practices that do not

have formal "teachings."  *Id.*[7]

Accordingly, the Administration implemented a policy of granting exemptions

for some religions, but not others.  The Administration made clear that it would "only

accept requests for religious exemption that cite to the official doctrine of an

organized religion . . . as announced by the leaders of that religion."  App'x Vol. V

at 1153.  An applicant whose religious beliefs departed from the "official doctrine" of

their religion would not qualify.  *Id.*  An applicant who did not adhere to "an

organized religion" would not qualify.  *Id.*  An applicant whose "religion" did not

have official "leaders" would not qualify.  *Id.*  An applicant whose religious

"leaders" did not publicly "announce[]" the religion's "official doctrine" with respect

to vaccines would not qualify.  *Id.*  In short, the Administration "passe[d] judgment

upon" and "presuppose[d] the illegitimacy of religious beliefs and practices" under

the September 1 Policy.  *Masterpiece Cakeshop*, 138 S. Ct. at 1731.

The Administration's discriminatory policy resulted in real-world

discrimination among religions.  *See* App'x Vol. V at 1129 ("Your exemption request

has been denied because it does not comply with the campus policy, which only

---

[7]  The partial dissent criticizes us for making "an appellate finding of fact" in concluding that there is animus here.  Dissent. Op. at 7.  But in applying the law to the facts of each case, appellate courts must sometimes evaluate the evidence in the record.  *See Kennedy*, 597 U.S. at 539–40.  And when the record admits no conclusion other than religious animus, we must say so.  *See Masterpiece Cakeshop*, 584 U.S. at 638.

recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."). For instance, the Administration's legal department was asked how the Administration would treat "Jehovah's Witnesses as an example," compared to practitioners of other religions who are "fully vaccinated against measles, mumps, etc. but want to say this vaccine violates their religious freedoms/rights." *Id.* at 1141. The Administration's counsel responded that "[p]ursuant to [the Administration's] policy the religious exemption applies to people whose religion precludes <u>all</u> vaccinations"—Jehovah's Witnesses, but not necessarily other sects. *Id.* Indeed, the Administration made clear that it would reject any applicant for a religious exemption unless her religion "teaches [her] and all other adherents that immunizations are forbidden under all circumstances." *Id.* at 1056. Therefore, the Administration refused to approve any exemptions for Buddhist applicants under the September 1 Policy. Nor would the Administration approve any exemptions for members of the Roman Catholic Church or the Eastern Orthodox Church. At the same time, the Administration admitted it would approve applications from practitioners of select, favored religions, such as Christian Scientists.

It is likely that the Does will be able to demonstrate that the September 1 Policy's discrimination against certain religions was motivated by animus. The record is replete with evidence of stereotypes about and prejudice toward certain religions and religious beliefs for being insufficiently "organized," insufficiently "official," or insufficiently "comprehensive" in the eyes of the Administration. The Administration "gave every appearance of adjudicating [the Does'] religious

objection[s] based on a negative normative 'evaluation of the particular justification' for [their] objection[s] and the religious grounds for [them]." *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 537). Regrettably, it "requires restating that government has no role in deciding or even suggesting whether the religious ground for [a] conscience-based objection is legitimate or illegitimate." *Id.* Because the Administration assumed that impermissible role, the Does are likely to prevail on their Free Exercise claim.

ii.     **The September 1 Policy categorically violates the Establishment Clause.**

The "intrusive religious inquiry" that the Administration conducted here is also flatly barred by the Establishment Clause. *Colo. Christian Univ.*, 534 F.3d at 1261 (capitalization omitted). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Accordingly, the government may not "pick and choose" religions "on the basis of intrusive judgments regarding contested questions of religious belief or practice." *Colo. Christian Univ.*, 534 F.3d at 1261. Such an inquiry violates the Establishment Clause's "prohibition of 'excessive entanglement' between religion and government," and is therefore "unconstitutional without further inquiry." *Id.* at 1261, 1267 (quoting *Agostini v. Felton*, 521 U.S. 203, 232 (1997)).

In *Colorado Christian University*, we evaluated a Colorado statute that discriminated against students at some religious universities, but not others, by refusing the students scholarships. 534 F.3d at 1250. We held that the statute

31

violated the Establishment Clause because it required "unconstitutionally intrusive scrutiny of religious belief and practice," and therefore evidenced "'excessive entanglement' between religion and government." *Id.* at 1250, 1261. Indeed, the statute was "fraught with entanglement problems." *Id.* at 1261. For instance, the statute required the government to evaluate whether any theology course offered by a university "tend[ed] to indoctrinate or [to] proselytize." *Id.* That forced the government "to decide how religious beliefs are derived" and to evaluate "the boundary between religious faith" and other beliefs. *Id.* at 1262. The statute at issue also asked government officials to evaluate individuals' "religious persuasion" and to assess whether, in the government's view, an individual belonged to one "particular religion" or to another. *Id.* at 1264.

As we held, none of that is constitutional. The Establishment Clause does not permit the "trolling through a person's . . . religious beliefs" required by the Colorado statute at issue in *Colorado Christian University*. 534 F.3d at 1261. Nor does it allow the sort of "governmental monitoring or second-guessing" of "religious beliefs and practices" that the state conducted. *Id.* Furthermore, by sorting individuals into different religious denominations and evaluating who counts as a member of "a particular religion" or "religious persuasion," the state acted as the "arbiter[] of scriptural interpretation." *Id.* at 1263–65. And "under the First Amendment, the government is not permitted to have an ecclesiology, or to second-guess the ecclesiology espoused by our citizens." *Id.* at 1265. Therefore, we held that Colorado's statute violated the Establishment Clause because it permitted the

government to impose its own ideas about which believers were valid members of which religious sects. *See id.* ("[T]he definition of who is a 'Christian' can generate an argument in serious circles across the country. . . . Similar questions plague the religious taxonomy of Jehovah's Witnesses, Christian Scientists, Unitarian-Universalists, various syncretistic groups and even (in some circles) the Roman Catholic Church.").

The September 1 Policy required a similarly intrusive inquiry into the validity of the Does' religious beliefs. It is evident that, under the September 1 Policy, the Administration rejected applicants' beliefs based not on their sincerity, but rather on their perceived validity. The Administration's official religious exemption form did not ask *whether* an applicant's sincerely-held religious belief prevented her from receiving the COVID-19 vaccine. It instead asked "why" an applicant's "sincerely held religious belief, practice, or observance prevents" her "from getting a COVID-19 vaccination." App'x Vol. V at 1147. The Administration also demanded that applicants explain whether they "had an influenza or other vaccine in the past," and justify how "this differ[s]." *Id.* The Administration further required an applicant for a religious exemption to "provide documentation that demonstrates that [her] religion is opposed to all immunizations." *Id.* at 1153. In response to the Administration's demands, some applicants submitted numerous pages of explanation of their religious beliefs, including deeply personal and private details about their religious journeys.

Nevertheless, if an applicant could not document an official religious doctrine to the Administration's satisfaction, Administration rejected the applicant's explanation of her own religious beliefs.  For instance, the Administration declared that, based on its own research, "it is 'morally acceptable' for Catholics to take vaccines against COVID-19."  App'x Vol. V at 1162.  As a result, the Administration decided that a Roman Catholic applicant's religious objection to the COVID-19 vaccine "does not constitute a religious belief, but a personal objection," because in the Administration's view, it is "of a personal nature and not part of a comprehensive system of religious beliefs."  *Id.* at 1162–63.

That is precisely the sort of religious entanglement the Establishment Clause proscribes.  As we have previously admonished the state of Colorado, "[i]t is not for the state to decide what Catholic—or evangelical, or Jewish—'policy' is."  *Colo. Christian Univ.*, 534 F.3d at 1263.  To avoid all doubt:  neither is it for the state to decide what "religious beliefs" must be held by Roman Catholics, or Buddhists, or Orthodox Christians, or anybody.  These are "question[s] of religious doctrine on which the State may take no position without entangling itself in an intrafaith dispute."  *Id.*

Under the September 1 Policy, the Administration conducted an intensive inquiry into applicants' religious beliefs; it sorted the applicants into religious sects; it pronounced the "official doctrine" of each sect; and it rejected applicants whose professed beliefs did not satisfy the Administration's theological litmus test.  That is "excessive entanglement," and it is among the Establishment Clause violations that

34

are "flatly forbidden without reference to the strength of governmental purposes."

*Colo. Christian Univ.*, 534 F.3d at 1266.  For this reason alone, the Does are likely to

prevail on their Establishment Clause claims.

**b.      The Does are also likely to prevail because the September 1 Policy cannot survive heightened scrutiny.**

The Does are likely to prevail on their First Amendment claims for yet another

reason:  the September 1 Policy fails strict scrutiny.  The district court abused its

discretion in ruling otherwise.

**i.      The September 1 Policy is neither neutral nor generally applicable.**

The September 1 Policy is subject to strict scrutiny because it is hostile toward

and discriminatory against certain religions.  Government actions "incidentally

burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise

Clause so long as they are neutral and generally applicable." *Fulton v. Philadelphia*,

141 S. Ct. 1868, 1876 (2021).  If a government policy "fail[s] either the neutrality or

general applicability test," it "trigger[s] strict scrutiny." *Kennedy*, 142 S. Ct. at 2422.

"Government fails to act neutrally when it proceeds in a manner intolerant of

religious beliefs or restricts practices because of their religious nature." *Fulton*,

141 S. Ct. at 1877.  And a government law or policy "is not generally applicable if it

invite[s] the government to consider the particular reasons for a person's conduct by

providing a mechanism for individualized exemptions." *Id.* (internal quotation marks

omitted).  The September 1 Policy was neither neutral nor generally applicable

because it was overtly intolerant of certain religious beliefs, and because it invited

the Administration to evaluate the religious beliefs of employees and students on a case-by-case basis.

The September 1 Policy was explicitly non-neutral.  The First Amendment never permits the government to "discriminate in favor of some religions and against others."  *Colo. Christian Univ.*, 534 F.3d at 1260.  Therefore, "statutes involving discrimination on the basis of religion, including interdenominational discrimination, are subject to heightened scrutiny whether they arise under the Free Exercise Clause, the Establishment Clause, or the Equal Protection Clause."  *Id.* at 1266 (citations omitted).  The September 1 Policy discriminated on the basis of religion because it "singled out" certain employees for better or worse treatment "precisely because" of the employees' religious beliefs.  *Shrum v. Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006).  If Jane Does 2 and 9 had been Christian Scientists, for instance, they would have been granted exemptions.  But because they were the wrong religions, their exemptions were denied.  Because the September 1 Policy discriminated "in favor of some religions and against others," it fails the neutrality test, and strict scrutiny applies.  *Colo. Christian Univ.*, 534 F.3d at 1260; *see Kennedy*, 142 S. Ct. at 2422.

Nor was the September 1 Policy generally applicable.  A government policy "is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct."  *Fulton*, 141 S. Ct. at 1877 (alteration in original) (internal quotation marks omitted).  As we have explained, under the September 1 Policy, the Administration did not ask *whether* an applicant had a sincerely-held religious belief prohibiting her from receiving the COVID-19 vaccine.  Instead, the

Administration asked *why* the applicant held her religious beliefs, and it granted or denied exemptions on a case-by-case basis. The Administration "consider[ed] the particular reasons" underlying the applicant's religious beliefs and provided "individualized exemptions" to applicants whose religious beliefs, in the Administration's discretion, justified an exemption. *Id.* The September 1 Policy was in no way generally applicable. That, too, would be enough to "trigger[] strict scrutiny." *Kennedy*, 142 S. Ct. at 2422.

### ii. The September 1 Policy does not satisfy strict scrutiny.

The Administration cannot meet its burden to demonstrate that the September 1 Policy satisfies strict scrutiny. Because the Does have shown that the September 1 Policy is neither neutral nor generally applicable, this Court must "find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 142 S. Ct. at 2422 (quoting *Lukumi*, 508 U.S. at 546). Indeed, "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546. And a government policy like the September 1 Policy "that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Carson ex rel. O.C. v. Makin*, 142 S. Ct. 1987, 1997 (2022) (alteration in original) (quoting *Lukumi*, 508 U.S. at 546).

"This is not one of them." *Carson*, 142 S. Ct. at 1997. Although "[s]temming the spread of COVID–19 is unquestionably a compelling interest," *Roman Cath.*

37

*Diocese of Brooklyn*, 141 S. Ct. at 67, the September 1 Policy is in no way tailored. An interest is not "drawn in narrow terms" if it is "overbroad or underinclusive in substantial respects." *Lukumi*, 508 U.S. at 546. The September 1 Policy is both. The Administration has not even attempted to explain why its interest is served by granting exemptions to practitioners of some religions, but not others. No one contends that Christian Scientists are any less likely to contract or to spread COVID-19 than Buddhists or Roman Catholics or Orthodox Christians. To paraphrase a prior opinion of this Court: the Administration's policy does not stop exemptions for religious beliefs; it stops only exemptions for religious beliefs the Administration deems inconsistent. *See Colo. Christian Univ.*, 534 F.3d at 1268. "This underinclusiveness undermines the defendants' claim of narrow tailoring." *Id.* There is simply no justification for the Administration's choice to tailor its policy to exclude some religions, but not others.

Indeed, the Administration gives up the game in this appeal. The Administration argued in its brief only that any controversy over the September 1 Policy was moot. The Administration did not contend that the September 1 Policy is neutral, nor generally applicable, nor narrowly tailored. As the Administration tacitly acknowledges, it is not any of those things. It is therefore highly likely the Does will succeed on the merits of the strict scrutiny analysis.

* * *

The Administration's inquiries into the sincerity of the Does' religious beliefs were precisely the sort of "trolling through a person's . . . religious beliefs" for which

this Court and the Supreme Court have repeatedly admonished state actors. *Colo. Christian Univ.*, 534 F.3d at 1261 (quoting *Mitchell v. Helms*, 530 U.S. 793, 828 (2000)) (collecting cases).[8]  Much like the government in *Colorado Christian University*, the Administration placed itself "in the role of arbiter of [] essentially religious dispute[s]," *id.*, such as what constitutes the "teachings" of a particular religion.  *See* App'x Vol. I at 61.  And the Administration adjudicated such religious disputes in a manner that discriminated against some religions, but not others.  The Administration announced that it would approve exemptions for some favored religious applicants, such as Jehovah's Witnesses or Christian Scientists, but at the same time rejected other religious beliefs, stereotyping them as "personal," not "religious," and "not part of a comprehensive system of beliefs."  *See, e.g.*, App'x Vol. V at 1077–78.  The Administration's conduct under the September 1 Policy was precisely the sort of conduct prohibited by the First Amendment, as explained by Tenth Circuit and Supreme Court precedent.

Because the September 1 Policy so deeply violates the First and Fourteenth Amendments, and because the Administration's actions under the September 1 Policy

---

[8]  The partial dissent criticizes our reliance on *Colorado Christian University*, 534 F.3d at 1245, because the partial dissent views it as "an Establishment Clause case" that says nothing about the Free Exercise Clause.  Dissent. Op. at 16.  As our preceding discussion should make clear, we rely on *Colorado Christian University* primarily in our Establishment Clause analysis, not our Free Exercise analysis. Regardless, as we held in *Colorado Christian University*, the "very process of inquiry" into religious beliefs "may impinge on rights guaranteed by the Religion Clauses"—*both of them*—and thus "presents a significant risk that the First Amendment will be infringed" in one way or another.  534 F.3d at 1264 (quoting *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979)).

are so clearly proscribed by our precedent, the Does are highly likely to succeed on the merits of their claims regarding the September 1 Policy.

> **2.    The other factors weigh in favor of a preliminary injunction.**

The remaining factors weigh in favor of granting the Does a preliminary injunction of the September 1 Policy.

Because Jane Does 2 and 9 continue to suffer harm of a constitutional dimension, such harm is irreparable.  The district court ruled that the Does had "failed to demonstrate a likelihood of success on their constitutional claims," and thus concluded that their "asserted harm is not of a constitutional dimension."  We disagree, for the reasons stated above.  And because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Jane Does 2 and 9 are likely to suffer irreparable harm absent a preliminary injunction.  *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67.

Finally, the continuing harm alleged by the Does outweighs any harm to the public interest.  As we have said before about state intrusions on religious liberty:  "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Awad*, 670 F.3d at 1132.  Accordingly, because the Does "have demonstrated a likely violation" of their constitutional rights, "an injunction would be in the public interest."  *Hobby Lobby*, 723 F.3d at 1147; *see also id.* at 1147–48 (finding that where a plaintiff "remain[s] subject to the Hobson's choice between" financial ruin "or violating [her] religious beliefs . . . the balance of equities tips in" the plaintiff's favor).

**B.    The district court abused its discretion in failing to enjoin the September 24 Policy.**

The district court also abused its discretion in failing to enjoin the

September 24 Policy.  The district court was obligated by our precedents carefully to

examine the Administration's motivations for the September 24 Policy, but it failed

to do so.  Because the September 24 Policy is tailored to reach precisely the same

results as the unlawful September 1 Policy, the Does are likely to prevail in showing

that the September 24 Policy is a product of discriminatory religious animus, not

neutral motivations.  Furthermore, because the September 24 Policy grants secular

exemptions on more favorable terms than religious ones, it is not generally applicable

on its face.  It is therefore the Administration's burden to demonstrate why the

September 24 Policy survives strict scrutiny.  And it cannot.  Thus, the district court

abused its discretion in applying rational basis review and in concluding that the

September 24 Policy survives judicial scrutiny.

**1.    Strict scrutiny applies to the September 24 Policy.**

The district court abused its discretion in failing to apply strict scrutiny to the

September 24 Policy because the Policy is neither neutral nor generally applicable,

and because the Does are likely to prove it is motivated by the same religious animus

present in the September 1 Policy.  "A rule that is discriminatorily motivated and

applied is not a neutral rule." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294

(10th Cir. 2004).  And a government policy "lacks general applicability if it prohibits

religious conduct while permitting secular conduct that undermines the government's

41

asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877.  For both reasons, the September 24 Policy is subject to strict scrutiny.  The district court abused its discretion and committed an error of law in applying rational basis review to the September 24 Policy.  *Tyson Foods*, 565 F.3d at 775.

### a.  The September 24 Policy is not neutral.

To determine whether the September 24 Policy is neutral, it is necessary under our precedents to examine the Administration's motivations for adopting it.  "Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged governmental action is not neutral." *Shrum*, 449 F.3d at 1145.  Therefore, for a "conventional" First Amendment claim concerning a "polic[y] applied domestically," it is necessary to probe the sincerity of the government's justifications for the policy to evaluate whether they "were but pretexts for discriminating against" religion.  *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018); *see, e.g.*, *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1234 (10th Cir. 1998) (en banc) (examining "the selection of the person who is to recite the legislative body's invocational prayer" for "an impermissible motive").  The Does' claims are "conventional" ones, like "the typical suit involving religious displays or school prayer." *Trump*, 138 S. Ct. at 2418.  It was thus the district court's duty to "survey meticulously the circumstances" of the September 24 Policy "to eliminate, as it were, religious gerrymanders." *Lukumi*, 508 U.S. at 534 (internal quotation marks omitted).

The district court abused its discretion because it failed to conduct this meticulous review and, as a result, reached a clearly erroneous conclusion.  The

district court concluded that the September 24 Policy was not a pretext employed by the Administration to reach the same results as the unlawful September 1 Policy.  The district court reasoned that "the fact that the [Administration] amended its policy while navigating a monthslong global pandemic does not show that its reasons for denying religious exemptions for students are pretextual."  App'x Vol. VII at 1670.  The district court then used its finding *for students* to deny relief to both students *and employees*, without undertaking any analysis of whether the policy for employees was similarly free of pretextual motives.  Accordingly, the district court applied the wrong law when it failed properly to consider the factors indicating that the September 24 Policy for employees may be motivated by religious animus.  "Factors relevant to the assessment of governmental neutrality include the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question," and "contemporaneous statements made by members of the decisionmaking body."  *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (internal quotation marks omitted).  When these factors are applied to the September 24 Policy, it is evident that the district court's conclusion was "manifestly unreasonable," and therefore an abuse of discretion.  *Tyson Foods*, 565 F.3d at 775–76.

The historical background of the September 24 Policy demonstrates that the Policy was not neutral toward religion.  The Administration adopted the September 24 Policy a mere twenty-three days after it adopted the hostile and discriminatory September 1 Policy.  As recounted above, the Administration had a

pattern throughout August and September of making statements hostile toward particular religions.  *See supra* at Part IV.A.1.  The Administration changed policies on September 24, only after receiving notice of impending litigation.  Instead of promptly reevaluating all employees immediately under the new, purportedly neutral policy, the Administration waited nearly three months to do so.  Then, when the Administration finally reevaluated its employees under the September 24 Policy, it conducted the same sort of inquiry it had under the September 1 Policy to determine whether, in the Administration's view, "the request [wa]s made based on a sincerely-held religious belief," or whether it was based on beliefs the Administration deemed "personal" in nature.  App'x Vol. VI at 1328–29; *compare id.*, *with* App'x Vol. V at 1077–78 (rejecting under the September 1 Policy exemptions for religious beliefs the Administration deemed "personal," not "religious," and "not part of a comprehensive system of beliefs").

It should be no surprise, then, that the Administration reached precisely the same results as it had reached under the old policy.  Under the September 1 Policy, the Administration denied Jane Does 1, 3, 10, and 11 any exemption or accommodation.  Under the September 24 Policy, the Administration denied Jane Does 1, 3, 10, and 11 any exemption or accommodation.  Under the September 1 Policy, the Administration required Jane Does 4, 5, and 6 and John Does 3, 4, 5, and 7 to work remotely, and the Administration cut Jane Doe 5's pay by ten percent.  Under the September 24 Policy, the Administration required Jane Does 4, 5, and 6

and John Does 3, 4, 5, and 7 to work remotely, and the Administration cut Jane

Doe 5's pay by ten percent.

It is manifestly unreasonable to think that the September 24 Policy would

reach precisely the same results as the September 1 Policy by accident.  The

Administration had spent weeks or months drafting and implementing a policy

hostile toward and discriminatory against certain religions, only to adopt a new,

purportedly neutral policy that reached precisely the same results.  Against the

backdrop of the Administration's recent "official expressions of hostility to religion,"

which the Administration has "not disavowed . . . at any point," the only reasonable

conclusion is that the September 24 Policy for employees was either selected or

applied to reach the same results as the September 1 Policy.  *Masterpiece Cakeshop*,

138 S. Ct. at 1732.  In other words, we "must draw the inference that [the Does']

religious objection[s] [were] not considered with the neutrality that the Free Exercise

Clause requires."  *Id.* at 1731.  The district court clearly erred in concluding

otherwise.

Because the September 24 Policy for employees was a mere pretext to

continue the Administration's September 1 Policy, it is subject to strict scrutiny.

Rational basis review is available only for a "neutral rule of general applicability,"

which "[a] rule that is discriminatorily motivated and applied is not."  *Axson-Flynn*,

356 F.3d at 1294; *see also Shrum*, 449 F.3d at 1145 ("Proof of hostility or

discriminatory motivation may be sufficient to prove that a challenged governmental

action is not neutral.").  Accordingly, the September 24 Policy "is subject to strict

45

scrutiny, and [its] burden on religious conduct violates the Free Exercise Clause
unless it is narrowly tailored to advance a compelling government interest." *Axson-
Flynn*, 356 F.3d at 1294 (internal quotation marks omitted).

> **b.     The September 24 Policy is not generally applicable.**

The September 24 Policy is not generally applicable because it grants secular
exemptions on more favorable terms than religious exemptions.  Relying on out-of-
circuit precedent and a now-overruled decision of our Court, the district court
concluded that the September 24 Policy does not selectively burden or target
religious conduct over secular conduct, and therefore that it was generally applicable.
Our precedents dictate otherwise.  When a Policy makes a "value judgment in favor
of secular motivations, but not religious motivations," it is not generally applicable.
*Grace United Methodist Church v. Cheyenne*, 451 F.3d 643, 654 (10th Cir. 2006)
(quoting *Fraternal Ord. of Police Newark Lodge No. 12 v. Newark*, 170 F.3d 359,
365 (3d Cir. 1999) (Alito, J.)).  Therefore, a government policy that grants an
exemption "for medical reasons" but denies the same exemption "for religious
reasons" is not generally applicable, as it "devalues religious reasons . . . by judging
them to be of lesser import than nonreligious reasons."  *Grace United Methodist
Church*, 451 F.3d at 654 (quoting *Lukumi*, 508 U.S. at 537–38) (citing *Fraternal Ord.
of Police Newark Lodge No. 12*, 170 F.3d at 364–66).

The September 24 Policy on its face makes a value judgment in favor of
secular motivations because it has a lower bar for denying religious exemptions.  The
September 24 Policy denies a secular medical exemption if it "poses a direct threat to

the health or safety" of others.  App'x Vol. V at 1255.  But a religious exemption is denied under the Policy even if the exemption does not rise to the level of "direct threat."  The Administration denies a religious exemption under the September 24 Policy if it merely "unduly burden[s] the health and safety of other individuals."  *Id.* at 1256 (capitalization omitted).  Because the September 24 Policy has a lower threshold for denying religious exemptions, it makes a "value judgment in favor of secular motivations, but not religious motivations."  *Grace United Methodist Church*, 451 F.3d at 654 (quoting *Fraternal Ord. of Police Newark Lodge No. 12*, 170 F.3d at 365).  Accordingly, it is not generally applicable, and it is subject to strict scrutiny. *See Grace United Methodist Church*, 451 F.3d at 654; *Fraternal Ord. of Police Newark Lodge No. 12*, 170 F.3d at 364–66.[9]

---

[9] The partial dissent correctly notes that a medical exemption may also be denied if it "poses an undue hardship."  Dissent. Op. at 25 (quoting App'x Vol. V at 1255–56). The partial dissent would hold that such language is "essentially the same" as the "unduly burden the health and safety of other individuals" language relevant to religious exemptions.  *See id.*  Maybe in a vacuum, but not in context.  It is clear that the September 24 Policy borrows from our Americans with Disabilities Act cases, which hold that an employer need not grant an accommodation when to do so would pose an undue hardship.  *See Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267 (10th Cir. 2015).  That "undue hardship" must be one borne by the employer *as a whole*.  *See id.*; *accord Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (holding that "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business," not when it simply has effects on other employees).  Thus, on one hand, a medical exemption may be denied only if such exemption would pose a substantial hardship on the whole hospital system or directly threaten an individual. On the other hand, a religious exemption may be denied if it would merely impose an undue burden on another individual.  That constitutes a lower threshold for denying religious exemptions.

### 2.    The September 24 Policy fails strict scrutiny.

The Administration has not met its burden to show that the September 24 Policy for employees can survive "the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546. A policy that is tailored specifically to target religious conduct is not narrowly tailored. *See id.* at 534–44. As the September 24 Policy has been applied to exclude precisely the same employees as the discriminatory September 1 Policy, it was evidently tailored to target the same religious conduct. *See supra* at Part IV.B.1.a.

Even setting that aside, the Administration failed to meet its burden to show the September 24 Policy is narrowly tailored. The Administration offers two sentences in support of its claim that the September 24 Policy is narrowly tailored to the compelling interest of reducing the spread of COVID-19, but its reasoning withers upon examination. According to the Administration, "[l]imiting in-person contact to vaccinated individuals is narrowly tailored to the Anschutz Campus' compelling interest because employees and students have a greater risk of contracting and spreading COVID-19 if they interact with unvaccinated patients, coworkers, and classmates." Aple. Br. at 41–42. But the narrow tailoring analysis requires explaining why the interest identified—abating the "greater risk" for individuals who must be present in-person on the Anschutz Campus—cannot "be achieved by narrower ordinances that burden[] religion to a far lesser degree." *Lukumi*, 508 U.S. at 546.

Because the Administration's explanation of its narrow tailoring is entirely conclusory, the Administration has not met its burden. The Administration does not explain how much "greater" the risk is; or why the denial of religious exemptions is the only way to reduce the risk; or why unvaccinated Anschutz employees pose more of a risk than other unvaccinated patients, coworkers, or classmates. What about unvaccinated employees of other institutions who interact with Anschutz employees on other campuses? What about employees of Anschutz who work elsewhere, and whose jobs never require them to set foot on the Anschutz Campus? Why does the September 24 Policy apply to them, and how is that narrowly tailored to the interest of protecting the Anschutz Campus? The Administration did not even attempt to answer any of these questions. The September 24 Policy is both over- and under-inclusive in ways that the Administration cannot explain—or at least, in ways that it did not explain. The unavoidable conclusion is that the September 24 Policy is not narrowly tailored to its purported ends. The September 24 Policy fails strict scrutiny.

As with the September 1 Policy, the Does are likely to prevail on their claims regarding the September 24 Policy. The other factors also weigh in favor of a preliminary injunction. "The loss of First Amendment freedoms" under the September 24 Policy "unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67. Likewise, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132. Accordingly, the district court abused its discretion by failing to grant the Does a preliminary injunction.

## V.    The partial dissent's arguments are unpersuasive.

The partial dissent disagrees with parts of our reasoning and with our conclusion that the Does are likely to succeed on the merits with respect to the September 24 Policy for employees. But before addressing such disagreements, let us first emphasize the points of agreement. The partial dissent agrees that the Does have standing, that this case is non-moot as to employees, and that we must therefore reach the merits concerning both the September 1 Policy and the September 24 Policy for employees. Dissent. Op. at 1; *see supra* at Part III. The partial dissent also agrees that the September 1 Policy discriminated in favor of organized religions that oppose all immunizations, and against employees who do not belong to such religions. Dissent. Op. at 3. The partial dissent further agrees that such discrimination likely violated the rights guaranteed by the Free Exercise Clause, and that the Administration has not yet demonstrated that the September 1 Policy satisfies strict scrutiny. *Id.* at 5–6. Accordingly, the partial dissent agrees that the Does are likely to prevail with respect to the September 1 Policy. *Id.* at 6–7. Furthermore, the partial dissent agrees that the continuing irreparable constitutional harm to the Does outweighs any interest the public has in the enforcement of the unconstitutional September 1 Policy. *Id.* at 19. Finally, the partial dissent agrees that a government policy is not generally applicable if it grants secular medical exemptions on more favorable terms than religious exemptions. *See id.* at 24–26.

The partial dissent parts ways with our analysis when it comes to the Administration's animus toward certain religious beliefs. The partial dissent reaches

the wrong conclusions in part because it begins with a grave misunderstanding of the context of this case.  The partial dissent argues that "[t]he starting point for analyzing the constitutionality of this mandate is well-established Supreme Court case law upholding vaccine mandates that do not provide <u>any</u> religious exemptions."  Dissent. Op. at 3.  As the partial dissent sees it, the fact that the Administration "decided to provide a religious exemption" at all "itself suggests solicitude, not animus, toward religious believers."  *Id.* at 5.  That is entirely backwards.

Unlike the defendants in cases relied upon by the partial dissent, the Administration in this case was required to provide a religious exemption.  The Administration is an employer subject to Title VII of the Civil Rights Act of 1964, which "requires employers to accommodate the religious practice of their employees unless doing so would impose an 'undue hardship on the conduct of the employer's business.'"  *Groff*, 600 U.S. at 454 (2023).  Thus, although "the First Amendment likely does not require any religious accommodations whatsoever to neutral and generally applicable laws," a government employer such as the Administration must still provide religious accommodations under Title VII, and "must abide by the First Amendment" in doing so.  *Kane v. de Blasio*, 19 F.4th 152, 168–69 (2d Cir. 2021) (per curiam).  The partial dissent relies on an array of cases that simply do not concern employer-employee relationships subject to Title VII.[10]  By comparing this

---

[10] *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (dicta) (children); *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 12 (1905) (all inhabitants of a town); *We The Patriots USA, Inc. v. Conn. Off. of Early Childhood*

case to such inapposite cases, the partial dissent begins at entirely the wrong "starting point." *See* Dissent. Op. at 3.

The partial dissent's incorrect framing of the issue permeates its analysis. It relies on its conclusion that the Administration "adopted the [vaccine] mandate . . . to protect the health and safety of its staff, students, and patients during the ongoing global pandemic," not "to suppress religion." Dissent. Op. at 13. But the Administration's motivation for the mandate itself is irrelevant. The mandate is not at issue in this case. What matters is how—and why—the Administration implemented the religious accommodations required by Title VII.

If the partial dissent had started at the right point, it would have reached the right destination. The September 1 Policy does not suggest "solicitude" toward religious believers, as the partial dissent suggests, because it is not a benefit for believers above and beyond what is required. *Contra* Dissent. Op. at 5. Instead, the September 1 Policy falls far below the requirements of Title VII, denying its protections to the vast majority of religious believers, and providing such benefits only to a select few with favored religious beliefs. In this context, it is clear that the Administration was trying to evade its Title VII obligations by denying

---

*Dev.*, 76 F.4th 130, 135 (2d Cir. 2023) (students and daycare children); *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1175 (9th Cir. 2021) (students); *Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 84 (E.D.N.Y. 1987) (schoolchildren); *Mosier v. Maynard*, 937 F.2d 1521, 1522 (10th Cir. 1991) (prison inmates); *cf. We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 274 (2d Cir.), *opinion clarified,* 17 F.4th 368 (2d Cir. 2021) (government acting as regulator, not employer).

accommodations to many believers based on their religious views.  This evidences a hostility toward religious believers, not a solicitude.

The partial dissent argues that there is "no evidence of actual animus" in this case because the Administration did not issue official statements with the same sort of egregious language present in cases like *Masterpiece Cakeshop*.  Dissent. Op. at 10–13 (citing *Masterpiece Cakeshop*, 584 U.S. 617).  True, unlike the government officials involved with *Masterpiece Cakeshop*, the Administration did not publicly associate the Does' beliefs with "slavery" or "the Holocaust."  *See Masterpiece Cakeshop*, 584 U.S. at 635.  But if that is the bar for an inference of hostility, it will almost never be cleared, even in most cases of egregious discriminatory animus.

The Supreme Court's opinion in *Masterpiece Cakeshop* identifies two different sorts of religious disparagement, at least one of which is present in this case.  As the Supreme Court explained, "[t]o describe a man's faith as 'one of the most despicable pieces of rhetoric that people can use,'" as the government did in *Masterpiece Cakeshop*, "is to disparage his religion in at least two distinct ways:  by describing it as despicable, and also by characterizing it as merely rhetorical—something insubstantial and even insincere."  584 U.S. at 635.  Based on the record now before us, it appears the Administration did not disparage religion in the first way; that is, it did not describe Roman Catholic or Buddhist views as "despicable."  But it adopted an official policy that explicitly disparaged such religious views in the *second* way.  The Administration made the core constitutional error of deeming certain religious views to be *per se* insincere and thus disparaging such views in its official policy.

53

Regrettably, the partial dissent repeats that very same error.  The partial dissent argues that the Administration "was entitled to ask applicants why they opposed being vaccinated."  Dissent. Op. at 1.  At a high enough level of abstraction, that sounds right—better stated, the Administration was entitled to ask applicants *whether* they opposed being vaccinated *for religious reasons*, rather than secular ones.  But an employee could answer that question with little more than "yes" or "no."  The *why* sought by the Administration, and endorsed by the partial dissent, transgressed all boundaries set by the Religion Clauses.  The Administration was not entitled to demand a further explanation about the mechanics of employees' religious doctrines, or to ask employees to detail why their religious beliefs proscribe receipt of a COVID-19 vaccine, or to require employees to justify the differences between their past religious views on other vaccines and their current religious views on COVID-19 vaccines.  But that is precisely what the Administration did.  *See* App'x Vol. V at 1147.  The partial dissent would permit such intrusive inquiries under the guise of "determin[ing] whether the applicant's religious belief underlying the exemption request was sincerely held."  Dissent. Op. at 15.  But to "characterize[e]" someone's religious beliefs as "merely rhetorical—something insubstantial and even insincere" is "to disparage his [or her] religion."  *Masterpiece Cakeshop*, 584 U.S. at 635.

## VI.    Conclusion

It is "clearly established that non-neutral state action imposing a substantial burden on the exercise of religion violates the First Amendment."  *Shrum*, 449 F.3d

at 1145.  The Administration's September 1 Policy is not neutral on its face; the

September 24 Policy is not neutral in practice; and both substantially burden the

Does' exercise of religion.  Because the Does' ongoing, irreparable First and

Fourteenth Amendment injuries outweigh any public interest against a preliminary

injunction, the district court abused its discretion in failing to grant the Does' motion.

REVERSED.